**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| GAIL J. ZIMMERMAN, on behalf of herself and all others similarly situated, <br><br>                    Plaintiff, <br> v. <br><br> MIDLAND NATIONAL LIFE INSURANCE COMPANY, <br><br>                    Defendant. | Case No.: <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Gail J. Zimmerman, on behalf of herself and all others similarly situated, for its Complaint against defendant Midland National Life Insurance Company ("Midland"), states as follows:

**Nature of the Action**

1.      This is a class action brought on behalf of Plaintiff and similarly situated owners of life insurance policies issued by Midland and its predecessors-in-interests (together, "Midland"). Plaintiff seeks to represent a class of Midland policyholders who are being subjected to an unlawful and excessive cost of insurance ("COI") rate increase by Midland in violation of the terms of their insurance policies. As a result of Midland's breaches of the policy, Plaintiff was injured and now seeks damages.

2.      Plaintiff owns a universal life ("UL") policy issued by Midland in 1992, which insures her own life. UL policies are permanent life insurance policies, designed to stay in force for the life of the insured so long as, among other means, what is referred to as the "surrender

1

value" is funded sufficiently to pay various charges, the largest of which are COI charges (also referred to as "mortality charges"). Those COI charges are, in turn, determined by multiplying the net amount at risk (the death benefit divided by a coefficient minus the policy value) by a COI rate. The following provision in Plaintiff's policy governs Midland's determination of COI rates:

> **COST OF INSURANCE RATE**
>
> The cost of insurance rate for the basic benefit amount and each increase is based on the insured's:
>
> 1. Sex
> 2. Attained age on the preceding policy anniversary.
> 3. Rate class.
>
> The costs will never be greater than those shown on page 2. The cost of insurance rates will be figured by the company yearly, based on an estimate of future mortality experience. Any change in cost of insurance rates will apply to all insureds of the same class as the insured.

3. In August 2022, Midland sent a cryptic letter to its policyholders notifying them of a massive increase in COI rates on certain of Midland's UL insurance policies. For example, after having paid premiums for more than 30 years, Midland suddenly increased Ms. Zimmerman's COI rates by various amounts, including a staggering 763.33% rate hike in a single year. Midland's regulatory filings reveal that, in addition to Ms. Zimmerman's policy, it increased the COI rates for at least seven other UL products in the last three years.

4. Midland disclosed no specific reason for the rate increase or its magnitude. It disclosed only that "[t]his decision was made after careful analysis of the insurance company's expectations of the future costs of providing benefits under your Policy." It added that "in all cases, the COI rates under the new scales are higher than under the old scale at some future date."

5. The increase breached the policies for several reasons. The first is that Midland based the adjustment in COI rates on considerations other than, and by ignoring altogether, "an estimate of future mortality experience," in contravention of the terms of Ms. Zimmerman's

policy. Midland's proffered reason for the rate hike, albeit cryptic, is at odds with the contract language. The contract states that "cost of insurance rates will be figured by the company, based on an estimate of <u>future mortality experience</u>." However, the increase letter states that the increase resulted from an analysis of the "company's expectations of the <u>future costs of providing benefits</u> under your policy." As Midland's own actuaries have recognized, "future mortality experience" and "future costs of providing benefits" do not mean the same thing, and if Midland had wanted to use the latter phrase in the contract, it could have, but it did not. The contract required Midland to determine COI rates "based on an estimate of future mortality experience," something that Midland's letter indicates it did not do.

6. Second, Midland's "estimate of future mortality experience" (EFME) has improved over the past three decades since Ms. Zimmerman purchased her policy. The Society of Actuaries ("SOA") and the American Academy of Actuaries (the "Academy") periodically publish mortality tables using information collected from America's largest insurers. Those tables show that mortality rates have been improving. In 2022, Midland's sole owner, Sammons Financial Group, participated in a study by the SOA that confirmed that mortality rates are expected to continue to improve. But in 2022, Midland hiked its COI rates—an adjustment that must be based on EFME—by as much as 763%. There is simply no possible way that this massive increase was based on a deterioration in Midland's EFME.

7. Third, Plaintiff's policy states that "[t]he cost of insurance rates will be figured by the company yearly." This means Midland should have last determined COI rates for the policies no more than one year prior to the COI increase (*i.e.*, in 2021), using its then-current EFME. It is simply impossible for Midland's EFME to have changed so much in a single year to justify the massive COI increases that Midland has imposed. EFME changes slowly over time; is reviewed

annually through actual-to-expected experience studies; and did not deteriorate enough to potentially justify a 763% COI increase in a single year.

8. Nor have mortality expectations deteriorated by 763% in 2022 relative to any other year in the history of the United States. This increase is extraordinary given the dynamics of how mortality expectations change. COVID-19 had been in full swing for over a year when Midland last determined its COI rates in 2021. And the contract refers to "an estimate of *future* mortality experience," not to the mortality that was experienced during the height of the COVID-19 pandemic before vaccines and herd immunity and less deadly strains waned COVID-19's impact.

9. Indeed, there is no change in cost factors of ***any type*** that could justify the COI increase of this magnitude. Like EFME, other anticipated experience factors are reviewed annually and change slowly over time. There is nothing that could have happened between 2021 and 2022 that could justify the massive COI increases that Midland has imposed on its long-time policyholders, nor is there anything that happened since policy issuance that would warrant such a massive rate hike.

10. The goal of the COI increases appears to be to induce what in the industry is referred to as "shock lapses." A shock lapse occurs when an insurer raises COI rates in order to induce policyholders—many of whom are elderly and cannot procure replacement insurance—to lapse or surrender their policies, and thereby allows the insurer to avoid paying death benefits altogether (despite collecting premiums for decades). Other insurers have assumed a shock lapse rate of 10% on far smaller COI increases. Midland's 700%+ COI increase is designed to induce a large number of lapses by making the policies prohibitively expensive.

11. Plaintiff, on behalf of herself and all similarly situated policyholders, seeks relief for the COI overcharges that Midland has wrongly imposed and continues to impose on its policyholders.

## The Parties

12. Plaintiff Gail J. Zimmerman is a resident and citizen of the state of Virginia. Plaintiff sues on behalf of herself and all other similarly situated and owns Midland policy number 1700521756 (the "Representative Policy"). This policy was issued in Virginia by TMG Life Insurance Company ("TMG") on May 12, 1992. In 2004, TMG (known then as Clarica Life Insurance Co.) merged with and into Midland. As part of the merger, Midland assumed the responsibility for insuring and administering all UL products formerly issued and administered by TMG or its successor Clarica, including the Representative Policy.

13. Defendant Midland is a corporation organized and existing under the laws of Iowa and lists 8300 Mills Civic Parkway, West Des Moines, Iowa as its statutory home office, main administrative office, and primary location of books and records in its most recent regulatory filings.

## Jurisdiction and Venue

14. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member (including Plaintiff) and one Defendant and the aggregate amount of damages exceeds $5,000,000. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

15. This Court has personal jurisdiction over Midland, which is incorporated in Iowa and has its principal place of business in West Des Moines, Iowa.

16. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)-(c) because the events giving rise to Plaintiff's cause of action occurred in this District, including Midland's determination of COI rates.

## Factual Background

### A. The Policies at Issue

17. The policies at issue are all flexible-premium, UL policies issued by Midland or its predecessors-in-interest (the "Subject Policies"). They were all issued on standardized policy forms and insureds are not permitted to negotiate their terms.

18. UL policies combine death benefits with a savings or investment component, often known as the "account value" or "policy value." One benefit of UL policies is that they offer flexibility to policyholders to determine the amount and timing of premiums necessary to keep the policies in-force. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for UL policies only need to cover the COI charges and certain other specified charges. Monthly, the COI charge is deducted from the policy value (*i.e.*, the savings component). Thus, the policyholder pays the COI (and other) charges to Midland. When the policyholder pays premiums to Midland, those premiums, less any premium expenses imposed by Midland, are applied to the balance of the policy value. That balance earns interest at the credited rate. This structure allows policyholders to choose between (1) minimizing their capital investment and generating greater rates of return through other investments and (2) using the UL policy as a savings vehicle and earning interest on the policy value.

19. Consequently, the size of the COI charge is highly significant to UL policyholders. First, it dictates the minimum amount of money that must be paid to keep a policy in force. Typically, if the surrender value diminishes such that the COI and other charges can no longer be

deducted, the policy will go into its grace period. In such case, if no additional premiums are paid during that period, and after issuance of an accurate grace notice, the policy will lapse. Second, high COI rates can quickly diminish the policy value and reduce the amount of money on which the policyholder can earn interest. Lastly, a higher COI rate decreases other benefits available to policyholders, such as the amount they can borrow against the policy.

20. The COI provisions in the Representative Policy are as follows:

**COST OF INSURANCE RATE**

The cost of insurance rate for the basic benefit amount and each increase is based on the insured's:

1. Sex
2. Attained age on the preceding policy anniversary.
3. Rate class.

The costs will never be greater than those shown on page 2. *The cost of insurance rates will be figured by the company yearly, based on an estimate of future mortality experience*. Any change in cost of insurance rates will apply to all insureds of the same class as the insured.

**COST OF INSURANCE.** The company figures the cost of insurance monthly on the deduction day. . . .

The cost of insurance is figured in the following ways:

1. DEATH BENEFIT OPTION 1
   WHEN THE DEATH BENEFIT IS THE BASIC BENEFIT AMOUNT: The basic benefit amount on the deduction day is divided by 1.0032737. The result is reduced by the policy value at the start of the policy month. The difference is taken times the cost of insurance rate.

   WHEN THE DEATH BENEFIT IS A PERCENT OF THE POLICY VALUE: The death benefit on the deduction day is divided by 1.0032737. The result is reduced by the policy value at the start of the policy month. The difference is taken times the cost of insurance rate.

This policy language specifies only one anticipated experience factor that Midland can and must consider when redetermining COI rates: "an estimate of future mortality experience." It further states that such redeterminations will happen "yearly."

**B.      Midland Hikes COI Rates Despite Continued Mortality Improvement Over the Course of Three Decades**

21.     In August 2022, Midland sent a cryptic letter to policyholders notifying them of a massive increase in COI rates on certain of its UL insurance policies. Midland did not disclose the specific actuarial justification for the increases. Instead, it stated that "[t]his decision was made after careful analysis of the insurance company's expectations of the future costs of providing benefits under your Policy." And it also stated that "in all cases, the COI rates under the new scales are higher than under the old scale at some future date."

22.     This COI rate increase is massive. For example, Ms. Zimmerman purchased her insurance in 1992. For more than 30 years she paid sufficient premiums, and Midland made COI deductions. But in 2022, Midland suddenly increased her COI rates by a percent ranging from 88.46% to 763.33%.

**TABLE OF CHANGES TO MONTHLY COST OF INSURANCE RATES PER $1,000**
For Basic Benefit Amount of $150,000.00 effective June 15, 1992

| Attained Age | Guaranteed Insurance Rate | Current Insurance Rate | New Insurance Rate | Percentage Change |
|---|---|---|---|---|
| 67 | 1.3600 | 0.2600 | 0.4900 | 88.46% |
| 68 | 1.4900 | 0.2600 | 0.5300 | 103.85% |
| 69 | 1.6200 | 0.2600 | 0.5700 | 119.23% |
| 70 | 1.7600 | 0.2600 | 0.6000 | 130.77% |
| 71 | 1.9400 | 0.2600 | 0.6400 | 146.15% |
| 72 | 2.1700 | 0.2700 | 0.6700 | 148.15% |
| 73 | 2.4400 | 0.2700 | 0.7100 | 162.96% |
| 74 | 2.7500 | 0.2700 | 0.7600 | 181.48% |
| 75 | 3.1100 | 0.2700 | 0.8000 | 196.30% |
| 76 | 3.5100 | 0.2700 | 0.8500 | 214.81% |
| 77 | 3.9400 | 0.2700 | 0.9000 | 233.33% |
| 78 | 4.3900 | 0.2700 | 0.9600 | 255.56% |
| 79 | 4.8900 | 0.2700 | 1.0100 | 274.07% |
| 80 | 5.4500 | 0.2800 | 1.0700 | 282.14% |
| 81 | 6.1000 | 0.2800 | 1.1400 | 307.14% |
| 82 | 6.8400 | 0.2800 | 1.2100 | 332.14% |
| 83 | 7.7000 | 0.2800 | 1.2800 | 357.14% |
| 84 | 8.6600 | 0.2800 | 1.3500 | 382.14% |
| 85 | 9.7000 | 0.2800 | 1.4400 | 414.29% |
| 86 | 10.8300 | 0.2800 | 1.5000 | 435.71% |
| 87 | 12.0300 | 0.2900 | 1.5600 | 437.93% |
| 88 | 13.3000 | 0.2900 | 1.6300 | 462.07% |
| 89 | 14.6700 | 0.2900 | 1.7000 | 486.21% |
| 90 | 16.1200 | 0.2900 | 1.7700 | 510.34% |
| 91 | 17.6800 | 0.2900 | 1.8500 | 537.93% |
| 92 | 19.4100 | 0.2900 | 1.9300 | 565.52% |
| 93 | 21.3900 | 0.2900 | 2.0100 | 593.10% |
| 94 | 23.8300 | 0.3000 | 2.1000 | 600.00% |
| 95 | 27.1600 | 0.3000 | 2.1900 | 630.00% |
| 96 | 32.3200 | 0.3000 | 2.2800 | 660.00% |
| 97 | 41.2100 | 0.3000 | 2.3800 | 693.33% |
| 98 | 57.8100 | 0.3000 | 2.4800 | 726.67% |
| 99 | 90.9000 | 0.3000 | 2.5900 | 763.33% |

23.     She is now 67 years old. At this age, finding suitable replacement insurance is prohibitively expensive. Or she might not be able find an insurance company willing to underwrite her policy at all. Either outcome defeats the purpose of *universal life* insurance that she purchased from Midland.

24.     Midland's regulatory filings reveal that, in addition to policies like Ms. Zimmerman's, it increased the COI rates for at least seven other UL products in the recent years.

25. The massive increase in the COI rates cannot be justified based on EFME because Midland's EFME has been improving. Mortality expectations are studied periodically industry-wide. Beginning at least in 1941, the National Association of Insurance Commissioners ("NAIC") has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry standard mortality tables that insurers use to calculate reserves and to set maximum permitted COI rates in UL policies. The IRS also uses the CSO tables to define what constitutes "life insurance," what constitutes a "reasonable mortality charge," and what is deductible for federal tax purposes.

26. The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table"). That table was the industry-standard table until 2001. In 2001, at NAIC's request, the SOA and the Academy produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table and (b) expected mortality rates had improved significantly each year since the 1980 table issued. The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted. . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.

27. The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table." This indicates a substantial improvement in mortality in a 20-year time period. The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality expectations as compared to the 1980 CSO Mortality Table.

28. Since the 2001 CSO Mortality Table was introduced, the SOA has continued to survey the death rates that large life insurance companies actually observe among their policyholders, in the process of analyzing expectations of future mortality experience. These surveys have consistently showed mortality improvements over the last three decades. For example, the SOA published Individual Life Experience Reports for the periods 2002-2004, 2005-2007, 2008-2009, 2009-2016, and 2017, each noting strong rates of improvement in mortality.

29. Another SOA study called the Mortality Improvement Survey Report confirms that conclusion. For example, in 2022, Midland's sole owner, Sammons Financial Group, submitted data to the Mortality Improvement Survey Report that confirmed that mortality rates will be improving.

30. Periodically the SOA will publish an updated table to reflect the evolving industry experience. Some major updates include: (a) 2001 Valuation Basic Mortality Table, (b) 2008 Valuation Basic Table, and (c) 2015 Valuation Basic Table. Each of these updates confirms that mortality has continued to significantly improve since the 2001 CSO Table. Other surveys have also noted mortality improvements. In May 2013, for example, the reinsurance company RGA published a report sponsored by the SOA enumerating mortality rates and mortality improvements at older ages, which showed material rates of mortality improvements.

31. Indeed, Midland acknowledges that, consistent with industry experience, its estimates of future mortality experience have improved. Each year, insurers must file annual interrogatory statements with the NAIC. These are sworn statements that are certified and signed by an actuary for the filing company. The interrogatories include questions regarding the determination of non-guaranteed elements (which include COI rates) and whether expectations have changed. For example, Question 4 asks: "Are the anticipated experience factors underlying

any nonguaranteed elements [e.g., COI rates] different from current experience?" In its 2022 filing, Midland stated: "Yes. Midland National understands 'current experience' to refer to average credible experience over a reasonable recent period . . . . Currently anticipated experience factors as to mortality rates differ from current experience in that mortality improvement is assumed . . . ." Midland has therefore acknowledged as recently as 2022 that it has experienced a trend of improved mortality and admits that it expects this trend to continue. Nothing changed between 2017 and 2022 to reverse this long-term trend.

C. **Midland Used Impermissible Factors to Increase COI Rates**

32. Given that anticipated mortality has only improved since the Representative Policy was issued, Midland's post-increase COI rates could not possibly have been determined based on EFME, and instead must necessarily have been based on impermissible factors that are not identified nor disclosed anywhere in the Subject Policies. Midland's own letter announcing the increase appears to confirm this: instead of stating that COI rates were increased due to an increase in Midland's "estimate of future mortality experience," Midland instead stated that it was increasing COI rates because of its "analysis of the insurance company's expectations of future costs of providing benefits under your Policy." But "expectations of future costs of providing benefits" is firstly ambiguous and secondly potentially includes a vast array of possible future cost factors such as crediting rates, surrender benefits, policy loans, administration expenses, taxes, cost of capital, executive benefits, etc. Whatever that phrase means, it does not mean the same thing as "estimate of future mortality experience."

33. Midland's regulatory filings appear to confirm that Midland has changed the way it determines COI rates in a manner that violates the terms of the Subject Policies. In its 2012

regulatory filing, Midland stated: "At the time that a universal life product is priced, the necessary *cost of insurance rates are determined based on the then anticipated mortality.*"

34. In 2013, Midland eliminated the reference to "anticipated mortality" and replaced it with a vague reference to multiple "pricing factors," stating: "At the time that universal life product is priced, the necessary *cost of insurance rates are determined based on the then anticipated pricing factors.*" This language is not consistent with the policy language.

35. Finally, in 2017, Midland's regulatory filing stated that COI rates will be based on "anticipated experience factors." This language is also not consistent with the policy language, which specifies only one anticipated experience factor—mortality—that will be used to adjust COI rates. If Midland (or its predecessors) wanted the right to increase COI rates based on anticipated experience factors other than EFME, it could have said so, but it did not. It cannot now, over thirty years later, re-write the contracts to add additional factors.

36. By ignoring the one anticipated experience factor identified in the Subject Policies—EFME—and dramatically raising COI rates based on anticipated experience factors that are not mentioned anywhere in Subject Policies, Midland has breached the terms of those policies.

**D.    Even if Midland Were Permitted to Use Anticipated Experience Factors other than EFME, the COI Increase is Still Unlawful**

37. Even assuming *arguendo* that Midland was permitted to use anticipated experience factors other than EFME to determine COI rates, the COI increase would still be unlawful. First, EFME must at a minimum be the main ingredient in COI rates. Yet EFME has only improved over the past three decades. Raising COI rates—by over 700% no less—is inconsistent with any possible interpretation of "based on an estimate of future mortality experience."

38. Second, the policies state that COI rates will be "figured" "yearly." This means that Midland was required to determine COI rates, using its then-current estimates, in, for example,

each of 2019, 2020, and 2021. But there is no possible way that Midland's expected future costs *of any type* could increase so dramatically from 2021 to 2022 to justify a substantial COI increase. Cost factor expectations change slowly over time, and Actuarial Standards of Practice (ASOPs) contain detailed requirements about assumption setting and credibility requirements. Given that COI rates were last determined by Midland in 2021 "based on an estimate of future mortality experience," there is nothing that could possibly justify the massive COI increases that Midland imposed in 2022.

39. Finally, Midland's rate increase notice also suggests that the COI increase was not imposed on a class basis. The Representative Policy requires that "[a]ny change in cost of insurance rates will apply to all insureds of the same class as the insured." But the letter sent to plaintiff admits that "[s]ome policy owners may experience an immediate decrease in their COI rates while others will experience an increase," and that "in all cases, the COI rates under the new scales are higher than under the old scale at some future date." Tellingly, the letter nowhere states that the same change in rates applies to all insureds of the same class. Midland's failure to apply the same rate increases on all insureds of the same class independently breached the terms of the contract.

### Class Action Allegations

40. This action is brought by Plaintiff individually and on behalf of a class pursuant to Rules 23(b)(3) of the Federal Rules of Civil Procedure. The class—referred to as the "COI Increase Class"—consists of:

> All owners of policies issued or insured by Midland, or its predecessors, subjected to cost of insurance rate scale increases that took effect in 2022 or 2023.

The COI Increase Class does not include defendant Midland, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

41. The class consists of hundreds of consumers of life insurance and is thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by Midland.

42. The claims asserted by Plaintiff are typical of the claims of the COI Increase Class.

43. Plaintiff will fairly and adequately protect the interests of the class and does not have any interests antagonistic to those of the other members of the class.

44. Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters and COI matters, as well as class and complex litigation.

45. Plaintiff requests that the Court afford class members with notice and the right to opt-out of any class certified in this action.

46. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over any individualized issues. Those common questions that predominate include:

   a. the construction and interpretation of the form insurance policies at issue in this litigation;

   b. whether Midland's increase of the COI rates on the Subject Policies violated the terms of those policies;

   c. whether Midland breached its contracts with Plaintiff and members of the class;

   d. whether Midland's EFME has improved;

   e. whether Midland's COI rates are based on EFME; and

   f. whether Plaintiff and members of the class are entitled to receive damages as a result of the unlawful conduct by Midland as alleged herein.

47. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

   a. the complexity of issues involved in this action and the expense of litigating the claims, means that few, if any, class members could afford to seek legal redress individually for the wrongs that Midland committed against them;

   b. when Midland's liability is adjudicated, claims of all class members can be determined by the Court;

   c. this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

   d. without a class action, many class members would continue to suffer injury, and Midland's violations of law will continue without redress while it continues to reap and retain the substantial proceeds of its wrongful conduct; and

   e. this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

48. Plaintiff realleges and incorporates all allegations of this complaint as if fully set forth herein.

49. The Subject Policies are binding and enforceable contracts.

50. The COI rate increases and conduct by Midland that preceded those increases have materially breached the Subject Policies in several respects including:

    a. Midland breached the policies by not determining COI rates based on the factor enumerated in the policies;

    b. Midland breached the policies by not basing COI rates on Midland's EFME; and

    c. Midland breached the policies by not applying the same change in rates to all insureds of the same class.

51. If any breach alleged herein is not explicitly covered by the terms of the contract, Midland has breached the covenant of good faith and fair dealing.

52. Plaintiff has performed all her obligations under the policies, except to the extent that her obligations have been excused by Midland's conduct as set forth herein.

53. As a direct and proximate cause of Midland's material breaches of the Subject Policies, Plaintiff and the COI Increase Class have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## **Prayer for Relief**

WHEREFORE, Plaintiff and the COI Increase Class pray for judgment as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding Plaintiff and the Class compensatory damages;

3. Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as costs; and

4. Awarding Plaintiff and the Class such other legal or equitable relief as this Court may deem just and proper under the circumstances, including the reinstatement of any policy that was surrendered or terminated following Defendant's breach.

**Demand for Jury Trial**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and the Class hereby demand a trial by jury as to all issues so triable.

Dated: September 8, 2023   Respectfully submitted,

/s/ Robin G. Maxon
Robin G. Maxon (AT0005005)
Chandler M. Surrency (AT0012332)
HOPKINS & HUEBNER, P.C.
2700 Grand Avenue, Suite 111
Des Moines, IA 50312
Tel:  515-244-0111
Fax:  515-697-4299
rmaxon@hhlawpc.com
csurrency@hhlawpc.com

SUSMAN GODFREY L.L.P.

/s/ Steven G. Sklaver
Steven G. Sklaver
(*pro hac vice* to be submitted)
Glenn C. Bridgman
(*pro hac vice* to be submitted)
Halley Josephs
(*pro hac vice* to be submitted)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel:   310-789-3100
Fax:   310-789-3150
ssklaver@susmangodfrey.com
gbridgman@susmangodfrey.com
hjosephs@susmangodfrey.com

Seth Ard
(*pro hac vice* to be submitted)
Ryan C. Kirkpatrick
(*pro hac vice* to be submitted)
Dinis Cheian
(*pro hac vice* to be submitted)
SUSMAN GODFREY L.L.P.

1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel:   212-336-8330
Fax:   212-336-8340
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com
dcheian@susmangodfrey.com

**ATTORNEYS FOR PLAINTIFF**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 8th day of September 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, a copy of which will be served upon all counsel of record registered with the CM/ECF system via Notice of Electronic Filing.

                                        */s/ Robin G. Maxon*
                                      **Robin G. Maxon**